# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| **DR. YVOUNE KARA PETRIE, DC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:13-cv-1486 |
| **VIRGINIA BOARD OF MEDICINE**, ) | |
| **RANDOLPH CLEMENTS, DPM**, in his ) | |
| individual capacity as a competitor with ) | |
| chiropractors in Virginia, and in his capacity as ) | |
| a member of the Virginia Medical Board, ) | |
| **KAMLESH DAVE, MD**, in his individual ) | |
| capacity as a competitor with chiropractors in ) | |
| Virginia, and in his capacity as a member of ) | |
| the Virginia Medical Board, ) | |
| **SIOHAN DUNNAVANT, MD**, in her ) | |
| individual capacity as a competitor with ) | |
| chiropractors in Virginia, and in her capacity as ) | |
| a member of the Virginia Medical Board, ) | |
| **WILLIAM HARP, MD**, in his individual ) | |
| capacity as a competitor with chiropractors in ) | |
| Virginia, and in his capacity as executive ) | |
| director of the Virginia Medical Board, ) | |
| **JANE PINESS, MD**, in her individual ) | |
| capacity as a competitor with chiropractors in ) | |
| Virginia, and in her capacity as a member of ) | |
| the Virginia Medical Board, and ) | |
| **WAYNE REYNOLDS, DO**, in his individual ) | |
| capacity as a competitor with chiropractors in ) | |
| Virginia, and in his capacity as a member of ) | |
| the Virginia Medical Board. ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

### INJUNCTIVE RELIEF SOUGHT AND JURY TRIAL DEMANDED

Plaintiff Dr. Yvoune Kara Petrie, DC ("Plaintiff"), by her undersigned attorney, alleges

as follows, upon actual knowledge with respect to herself and her own acts, and upon

information and belief as to all other matters:

## NATURE OF THE ACTION

1.      Virginia chiropractors threaten the profits and lifestyle of Virginia medical doctors.  From the medical doctor's perspective, chiropractors are invading their "turf" by treating patients' conditions and the underlying causes of their conditions both less expensively and often more effectively.  Moreover, throughout the country, chiropractors are often replacing medical doctors for patients' point of primary care.  With growing calls for better patient care at lower costs, this competitive threat is a serious problem for medical doctors.  Indeed, health care and its skyrocketing costs invade policy debates year-after-year.

2.      The competitive threat to medical doctors from Virginia chiropractors, however, is representative of a much broader movement that challenges our current healthcare structure of treating symptoms of disease and other problems instead of creating overall wellness through holistic and functional approaches that focus on the underlying processes (including diet and lifestyle) that create disease and other problems.  These "alternative" approaches to healthcare have the potential to both revolutionize peoples' lives and save a lot of money (without resorting to a government-run health-plan).  Chiropractors, including Virginia chiropractors, are on the cutting-edge of these innovative approaches.  However, like any industry threatened with "disruptive" models or technology, medical doctors have a strong incentive to take whatever actions are necessary to slow this new approach, however beneficial. And that is exactly what the Virginia Board of Medicine and its majority-controlled medical doctors have done.

3.      Competition among service-providers is good for the customer because the suppliers must lower prices or improve their service to persuade consumers to select them over

the supplier's competitor.  Indeed, the U.S. Supreme Court has explained that "[t]he heart of our national economy has long been faith in the value of competition."[1]

4.      Sometimes an entrenched class of providers will begin to face competition from different types of providers that compete through new or different services, better prices, more effective delivery of services, or an alternative approach.  When this happens—and it happens a lot—it is uncomfortable.  The entrenched providers may see their profits shrink, their customers might come around less, and their current operations—which may have stayed the same for years or decades—are no longer adequate.

5.      The entrenched providers can take one of two paths when facing a new competitive threat.  The first path is to compete better: the service-provider might reduce prices, improve services, or sometimes even change their entire approach to better keep and attract customers.  Complacency is the enemy of this path.  This first path represents the foundation of our economic system and collectively improves our lives every day.

6.      The second path focuses on the competitor instead of competition: the service-provider attacks the new competitors and finds some way to keep them from effectively competing for customers.  From the psychological perspective of the entrenched provider, it is understandable.  They are used to a way of life and do not want to change.  Moreover, after years of following and living an approach, it is not uncommon that these entrenched providers—themselves feeling threatened—might reflexively attack their competitors rather than looking in the mirror and improving their own business.

7.      This second path is well traveled and is one of the reasons we have the federal antitrust laws, which embody "fundamental national values of free enterprise and economic

---

[1]      *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

competition."[2]  The entrenched provider that eliminates its competitor from its market harms

competition, and therefore consumers.  The federal antitrust laws protect competition by creating

a cause of action for competitors that are harmed through anticompetitive conduct—often

exercised on this second path.

8.     The Plaintiff seeks antitrust relief because the medical doctors on the Virginia

Board of Medicine (the "Board" or "Defendant") joined together to keep Plaintiff, a Virginia

Chiropractor and primary care provider, from competing against medical doctors in areas where

their respective customers overlap.  Recognizing the increasing competitive threat of

chiropractors in Virginia and elsewhere to medical doctors, these medical doctors travelled down

the second path—by exercising their market power to keep medical-doctor competitors, like

chiropractors, from invading their "turf."

9.     This is a case by a solitary chiropractor against a powerful board and some of the

medical doctors that dominate it. She stands alone on the caption, but brings this case—not only

to vindicate her own rights and competitive injuries—but to stand up for the many other

chiropractors and other holistic and alternative-health providers that are constantly bullied by

state medical boards and doctors. She brings this case for her patients and the patients of those

like her—health providers that see a better way of helping people live healthy than the tired

method of healthcare monopolized by medical doctors. She brings this case so she and others

like her have the opportunity to compete to improve and save lives.

## THE PARTIES

10.    Plaintiff is a citizen of the United States and a resident of Fairfax County in the

Commonwealth of Virginia where, until earlier this year, she used to practice chiropractic,

---

[2]      *Federal Trade Comm'n v. Phoebe Putney Health Sys., Inc.*, 133 S.Ct. 1003, 1010 (2013).

including complementary and alternative medicine ("CAM")[3], functional medicine and functional neurology, under the business name "Virginia Functional Medicine, Inc.", with an address at 410 Pine Street SE, #320, Vienna, Virginia 22180.

11.    Defendant, Virginia Medical Board (the "Board" or "Defendant"), is a quasi-public and quasi-private agency established under the laws of the Commonwealth of Virginia, charged with regulating the practice of Medicine, Podiatry, Osteopathy and Chiropractic among other branches of the healing arts in Virginia.   It has its official address at 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

12.    Defendant, J. Randolph Clements, DPM, a doctor of podiatry residing and practicing in Virginia, in his individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in his capacity as a member of the Virginia Medical Board.

13.    Defendant, Kamlesh Dave, MD a medical doctor, residing and practicing in Virginia, in his individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in his capacity as a member of the Virginia Medical Board.

14.    Defendant, Siobhan Dunnavant, MD, a medical doctor, residing and practicing in Virginia, in her individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in her capacity as a member of the Virginia Medical Board.

15.     Defendant, William Harp, MD, a medical doctor, residing and practicing in

---

[3]    The National Center for Complementary and Alternative Medicine, a division of the National Institute for Health, defines "Complementary" generally as using a non-mainstream approach together with conventional medicine, and "Alternative" as using a non-mainstream approach in place of conventional medicine.

5

Virginia, in his individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in his capacity as executive director of the Virginia Medical Board.

16.     Defendant, Jane Piness, MD, a medical doctor, residing and practicing in Virginia, in her individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in her capacity as a member of the Virginia Medical Board.

17.     Defendant, Wayne Reynolds, DO, osteopath,[4] residing and practicing in Virginia, in his individual capacity as a competitor with chiropractors (including plaintiff) in Virginia, and, additionally and separately, in his capacity as a member of the Virginia Medical Board.

18.     Defendants Clements, Dave, Dunnavant, Harp, Piness, and Reynolds shall be referred to collectively (in both their individual competitor and official capacity as Virginia Medical Board members) as the "Individual Defendants."

19.     The Individual Defendants are named in their individual capacity because each of them are actual and potential competitors with each other and actual and potential competitors with Plaintiff.  Thus, each of them and Plaintiff have a horizontal relationship.  This horizontal relationship is separate and apart from Individual Defendants' role as members of the Virginia Board of Medicine.  The Individual Defendants and the Board will be referred to collectively as "Defendants."

---

[4]   Doctors of osteopathy, although sometimes referred to separately, are also, for purposes of this Amended Complaint, included within the definition of medical doctors.

## JURISDICTION AND VENUE

20.     This is an action to recover treble damages and injunctive relief for injuries resulting from Defendants' violations of the antitrust laws of the United States.  The Court has primary jurisdiction over this action pursuant to Title 15 of the United States Code, 28 U.S.C. §§ 1331 and 1337(a), and Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

21.     This Court has supplemental jurisdiction over all State of Virginia causes of action pursuant to 28 U.S.C. § 1367.

22.     All relevant acts constituting the antitrust and state law violations alleged in this action occurred within the judicial district of this court, so that venue is proper in the Eastern District of Virginia under the provisions of 28 U.S.C. § 1391(b), as well 15 U.S.C. §§ 15 & 22.

23.     The Board is subject to personal jurisdiction in Virginia because its official address is in Virginia, and because it conducts its business in Virginia.  All individuals are subject to personal jurisdiction in Virginia because they reside in Virginia, work in Virginia, and serve the Virginia Medical Board in Virginia.


## SUBSTANTIVE ALLEGATIONS

### I.     BACKGROUND

24.     The concept of chiropractic as a healing art emerged with the first chiropractic adjustment in the late 1890's.  The passage of the first chiropractic licensing bill (by both houses of the Minnesota legislature) in 1905 established chiropractic as a credible modality for treating human ailments and conditions.  Ever since then the medical profession has mounted a consistent campaign to discredit the practice of chiropractic as mere quackery while strategically branding practitioners of that branch of the healing arts as engaged in the unlawful practice of medicine without a license.  Prosecution of many chiropractors was instigated by state medical boards and

their participant medical doctors "determined to crush all challengers to their authority," and many chiropractors were convicted and jailed and/or fined due to the actions of these medical boards and the controlling medical doctors.[5] Practitioners of Osteopathy, who later banded with the medical profession, also mounted various attacks on the chiropractic profession as a bastardized form of osteopathy and sought to distance themselves by seeking a separate licensure.[6]

25.    This organized and extensive campaign to discredit the practice of chiropractic over a 60-year period escalated to a head when, in 1963, the American Medical Association ("AMA") established a "Committee on Quackery" with the mandate of containing and eventually eliminating the chiropractic profession.  The AMA in various official publications described the chiropractic profession as an "unscientific cult" and decreed that it was unethical for medical doctors to associate themselves with a group of "unscientific practitioners" (read chiropractors).[7] The American Chiropractic Association (ACA) also formed in 1963.

26.    In 1987 in the landmark case of *Chester Wilk v. American Medical Association*, 671 F.Supp. 1465 (N.D. Ill. 1987),[8] the AMA was found to have violated Section 1 of the

---

[5]    At one point, an estimated 15,000 lawsuits were filed against chiropractors in the early part of the 20th century. *See Chiropractic History: a Primer*, by Joseph C. Keating, Jr., Ph.D., et al, published by the Association for the History of Chiropractic, available at http://www.historyofchiropractic.org/books.
[6]    In the early development of both modalities there seemed to be some consensus that the human body was similar to a "machine" where various parts and organs could be skillfully maneuvered through spinal manipulation and the regulation of joint dysfunction to institute a drugless cure and bring relief to a patient.  While osteopathy identified this process as "somatic dysfunction" affecting the circulatory system, chiropractic described the manipulative process as "subluxation," a way of regulating the human nervous system.
[7]    *Chiropractic History: a Primer, supra,* at pp. 32-35.
[8]    Also see the subsequent appeal at 895 F. 2d 352 (7th Cir. 1990).

Sherman Act by engaging in an unlawful conspiracy in restraint of trade in its attempt to eliminate the chiropractic profession through its national boycott strategies.[9]

27. The medical profession continues to hold their chiropractic counterparts as inferiors despite this decision and the emergence in the 1980s of a chiropractic renaissance establishing the chiropractic profession as a scientifically-backed modality for the treatment of musculoskeletal conditions through spinal manipulations and other non-invasive procedures.

28. The standards and scope of chiropractic through accredited chiropractic colleges have grown far beyond that of spinal manipulation. Chiropractic emerged in the 21st century as an even greater competitive threat to the medical profession—that of a primary-care provider. Chiropractors now graduate with the requisite accredited education and training to practice as primary-care providers. The medical profession, however, has aggressively fought expansions of chiropractors and others onto their "turf." The AMA broadcasts this by posting articles on its web site summarizing current litigations against chiropractors relating to scope of practice issues.[10]

29. Doctors of Chiropractic are not only trained primary care providers, but most chiropractic doctors have also been practicing complementary and alternative medicine (CAM) since the inception of chiropractic. According to the National Center of Alternative and Complementary Medicine (NCCAM), nearly 40% of Americans "use health care approaches

---

[9]     The steps outlined by the AMA committee on quackery designed to contain and ultimately eliminate chiropractic included a) ensuring that Medicare did not cover chiropractic, b) ensuring that the US Office of Education did not recognize a chiropractic accrediting agency, c) encouraging the continued separation of then existing two national associations (the ACA and the UCA) and d) encouraging state medical societies to take initiatives at the state legislative level regarding the promulgation of laws that would negatively impact the chiropractic profession.

[10]     http://www.ama-assn.org//ama/pub/physician-resources/legal-topics/litigation-center/case-summaries-topic/scope-practice.page

developed outside of mainstream Western, or conventional, medicine for specific conditions or overall well-being."[11]

30.     CAM practitioners focus on treating the "whole person" and incorporate a variety of modalities such as dietary modification, nutrition, supplements (containing botanicals, vitamins, minerals, etc.), meditation, acupuncture, massage, yoga, homeopathy and Chinese medicine.  Chiropractors have stood on the forefront and continue to lead a growing body of CAM practitioners.[12]   They are unique in that most of them have decades of experience as CAM practitioners and can incorporate this into their primary care practice.[13]  Thus chiropractors pose one of the greatest competitive threats to the long-standing and entrenched medical profession as a nearly "one-stop-shop" for patients (only necessitating referral of a patient to the medical profession for needed specialty care, medication management and/or surgery).

31.     The medical profession continues to seek limits on the scope of practice for chiropractors (as well as other CAM and non-medical health practitioners).  The AMA's activities have unfortunately harmed patients by worsening much needed access to care in current times of a nation-wide primary care provider shortage.[14]  The following are examples of the AMA's activities to limit competition with medical doctors:

(a)     In 2003, the AMA formally created the Scope of Practice Partnership when the AMA House of Delegates' adopted Resolution 814.[15] The AMA's stated goal was to

---

[11]     http://nccam.nih.gov/health/whatiscam
[12]     Examples of other CAM practitioners include acupuncturists, midwives, doctors of naturopathy, and homeopaths.
[13]     Across the United States there are four types of stand-alone primary care providers – doctors of chiropractic, medicine, naturopathy and osteopathy. Doctors of Naturopathy are licensed in 17 states and the District of Columbia.
[14]     *See* Chiropractic Scope of Practice Update https://www.acatoday.org/content_css.cfm?CID=5307 October 2013.
[15]     The SOPP was formed by a group of 10 medical executives representing five states and five

study the qualifications, education, academic requirements, licensure, certification, independent governance, ethical standards, disciplinary processes, and peer review of non-medical health practitioners, so that the AMA can affect each non-medical practitioner's scope of practice.

(b)     The AMA's April 2007 policy H-270.958 "Need for Active Medical Board Oversight of Medical Scope-of-Practice Activities by Mid Level Practitioners"[16] sought to place doctors of medicine and/or osteopathy on state medical boards to be assertive in limiting the scope of non-medical practitioners that encroach on the practice of medical and osteopathic doctors.

(c)     The AMA's year 2000 directive D-35.999 "'Non Physicians' Expanded Scope of Practice (Laboratory Testing and Test Interpretation)" seeks to "ensure that diagnostic laboratory testing should only be performed by those individuals who possess appropriate clinical education and training, under the supervision of licensed physicians (MD/DO); and… limit laboratory test ordering and interpretation of test results solely to licensed physicians (MD/DO) and licensed dentists."[17]

32.     The Virginia Medical Board and the Individual Defendants are in the perfect position to limit the scope of chiropractors because there is no separate chiropractic board in Virginia.[18]  The Medical Board, made up primarily of Virginia medical doctors and other competitors to chiropractors, controls the extent of competition between medical doctors and chiropractors by regulating both professions.

---

medical specialty societies concerned about scope expansion by non-medical health practitioners.
[16]     https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fHnE%2fH-270.958.HTM
[17]     https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fDIR%2fD-35.999.HTM
[18]     The Commonwealth of Virginia is one of only 3 or so states in the country without a separate Chiropractic Board.

33.     Doctors of Osteopathy and Doctors of Podiatric Medicine (DPM) [19], like medical doctors, also compete with chiropractors and have similar financial incentives to limit the scope of chiropractic. The practice of medicine, podiatry and osteopathy relies on the treatment of symptoms (i.e. if a patient has high blood sugar they are put on a medication to lower it).  The practice of chiropractic relies on the determining the cause of a symptom and treating the cause (i.e. if a patient has high blood sugar a chiropractor will determine why the blood sugar is high and treat the cause.  To elaborate a patient may have high blood sugar because an area of the brain involved in regulating response to stress has inappropriate activity, which a doctor of chiropractic can help normalize and blood sugar goes down). A podiatrist would also treat a diabetic (from the symptomatic perspective) and commonly are the first doctor to diagnosis a diabetic due to complications this disease can cause in the lower extremities.  Thus, doctors of chiropractic compete directly with medical doctors, podiatrists and doctors of osteopathy for patients with the same symptoms. This also creates an important distinction when there is overlap in scope, such as treating a diabetic.  It is the method of treatment (treating symptom compared to cause) that differentiates doctors of chiropractic from medical doctors, podiatrists and doctors of osteopathy.

34.     The financial incentives that individual defendants have to limit the scope of chiropractic also make them biased to have control and power over the overlap of chiropractic and medical doctors of osteopathy. That is, individual defendants have an economic conflict of interest in making determinations that affect the extent of competition between their own field (medicine and osteopathy) and an overlapping or adjacent field like chiropractic.

---

[19]     Doctors of Podiatric Medicine have the same training as an MD and DO, with a specialty in disorders of the lower extremity.  DPMs are trained and fully licensed to independently perform full-body history and physical examinations in any setting for any patient.

## II.   THE VIRGINIA BOARD OF MEDICINE AND INDIVIDUAL DEFENDANTS LIMIT THE SCOPE OF PLAINTIFF'S PRACTICE

35.     Plaintiff, a Doctor of Chiropractic, is licensed to practice chiropractic in the Commonwealth of Virginia with effect from July 12, 2006.  Before the suspension of her license (#0104-556481), Plaintiff's license was continuously active since the date it became effective. Plaintiff is also admitted to practice chiropractic in the state of California effective from 2003, and is licensed (inactive) as a chiropractor in New South Wales, Australia.  She is also a fellow of the International Pediatric Chiropractic Association.

36.     Plaintiff practices as a primary care provider, more specifically employing a form of chiropractic that incorporates CAM, functional neurology and functional medicine[20] under the name "Virginia Functional Medicine, Inc.," in Vienna, Virginia, in Fairfax County. She advertises her practice through various media in particular fields of the healing arts both as a chiropractic primary care provider as well as in chiropractic functional medicine and neurology. Plaintiff's practice includes addressing the underlying causes of neuropathy, autoimmune conditions, Type II diabetes, thyroid, and other health conditions in her patients.

37.     By letter dated February 2, 2012, the Department of Health Professions issued to Plaintiff a notice informing her that an Informal Conference had been scheduled for March 22, 2012, at which a special committee of the Board and individual defendants would inquire into purported allegations that Plaintiff may have violated certain laws and regulations governing the practice of chiropractic within the Commonwealth.

---

[20]     Functional Medicine involves the promotion of "wellness on the fundamental underlying factors that influenced every patient's experience of health and disease."  Functional Medicine "helps clinicians identify and ameliorate dysfunctions in the physiology and biochemistry of the human body as a primary method of improving patient health."  This preventative approach of addressing the underlying causes of diseases is the epitome of the licensed practice of chiropractic.

38.     At the May 3, 2012 Informal Hearing (the "Informal Hearing"), the Board issued Plaintiff a reprimand, imposed a $2,500 fine, and required that she provide Defendant with a written statement verifying compliance with the laws regulating the practice of medicine and the other healing arts (Chapter 29 of Title 54.1 of the Virginia Code) and the Regulations governing the practice of Medicine, Osteopathy, Podiatry and Chiropractic (under Health Regulations 18 VAC 85-20-10, *et seq.*)

39.     The Board also ordered Plaintiff to stop using a benign laser device in her practice.  Plaintiff—despite her contention that use of this device is within the scope of chiropractic in Virginia, and that no Virginia law or regulation justified the Defendant's ruling— ceased using the laser device in her practice on counsel's advice the day after the Board's Informal Hearing in May 2012, and promptly discontinued related advertising.

40.     In accordance with Va. Code § 2.2-4020.A, Plaintiff requested a formal administrative hearing before the Defendant Board, at which point the Order from the Informal Hearing was vacated.

41.     After the February 22, 2013 formal hearing ("Formal Hearing") before a panel comprised predominantly of medical doctors (including Individual Defendants) and not a single chiropractic doctor, the Board and Individual Defendants issued a February 28, 2013 order suspending Plaintiff's chiropractic license for a 6-month period and imposing a monetary penalty of $25,000.00 on Plaintiff, among other punitive measures.

42.     Plaintiff duly gave notice of her intention to appeal the Order handed down by the Board within the 30-day period allowed under the rules and thereafter lodged a petition through her counsel for Judicial Review with the Circuit Court at Fairfax County on May 30, 2013.

43.     Plaintiff requested that the Board stay enforcement of its February 28, 2013

Order, pending the outcome of the appeal, but the Board denied that request. Thus, regardless of

the outcome of the appeal, Plaintiff has already suffered harm from Defendants' conduct,

including the loss of her license and other actions by the Board and Individual Defendants.

44.     By the terms of the February 28, 2013 Order, Plaintiff's license may only be

reinstated subject to the conditions, among others, that:  a) Plaintiff ceases from advertising that

completion of post-doctoral training or continuing professional educational training or her

provision of training or continuing education to others provides her with expertise in any subject

unless such training or continuing education is received from or provided by the Council on

Chiropractic Education ("CCE"), b) Plaintiff should limit her practice of chiropractic, which the

Board arbitrarily concluded "does not include the diagnosis, management, or treatment of thyroid

disease, diabetes, metabolic disease, or interpreting medical tests or examinations", and c) that

furthermore, Plaintiff's practice shall not include or imply that her services includes "…the

prevention, diagnosis and treatment of human physical or mental ailments, conditions, diseases,

pain or infirmities by any means or method."  Thus, by the terms of the Board's order, Plaintiff, a

chiropractor, if she wants her license restored in the future may not even treat "pain" by any

means or methods.

45.     The Order of the Defendant Board of February 28, 2013 also held that Plaintiff

"shall not claim to prevent, diagnose, or treat the traditional ailments, conditions and diseases of

medicine or surgery, obstetrics, or osteopathy in any of her promotional materials, in paper form,

electronic form, or other, and Dr. Petrie shall not administer or prescribe any drugs, medicines,

serums or vaccines" [read shall not prescribe vitamins or dietary supplements].[21]

---

[21]     The Board and Individual Defendants accused Plaintiff of practicing as a Nutritionist and/or

### A.     The Composition of the Board.

46.     The Commonwealth of Virginia is one of very few states without a separate

Chiropractic Board to regulate the practice of chiropractic within the state.[22]  All actionable

disciplinary complaints involving chiropractors are managed by the Virginia Board of Medicine.

47.     At the Informal Hearing of Plaintiff's case before the Board, only a single

chiropractor (the only chiropractic member on the Virginia Board of Medicine) participated.

Worse, during the Formal Hearing of Plaintiff's case, there was not a single chiropractor on the

panel.  The lone chiropractor on the Defendant Board, Dr. Valerie Lowe Hoffman, DC, was

eliminated as "tainted" following her participation on the preliminary panel during the Informal

Hearing.

48.     The panel in question was made up of Dr. Irina Farqhuar (citizen member),

Dr. Siobahn Dunnavant, MD, Dr. Wayne Reynolds, DO, Dr. William Harp, MD, Stephen

Heretick, JD (Chairperson), Dr. Jane Pinness, MD, Dr. Kamlesh Dave, MD, Dr. Randolph

Clements, DPM and Jane Maddux (citizen member), all of whom ruled against the Plaintiff with

the exception of one citizen member, Dr. Farqhuar.  These individuals, with the exception of Dr.

Farqhuar and Jane Maddux (citizen members), are co-conspirators with the Board (in their

individual capacity as competitors) in an agreement to harm competition and Plaintiff, as

described throughout this Amended Complaint.  Medical doctors and doctors of osteopathy have

---

Dietitian without the requisite training or license. Since there was no allegation that Plaintiff ever
prescribed any drugs, serums, medications or vaccines to her patients and none was established at the
hearing, this restriction can only imply that her prescription of vitamins and supplements were beyond the
scope of her training.

[22]     As far back as October 13, 1999, the Department of Health Professions recommended the
creation of an independent Board of Chiropractic to regulate chiropractors in Virginia. *See* "Study of the
Merit of an Independent Board of Chiropractic", Senate Document No.5 of that year pursuant to the
Senate Joint Resolution SJR433 (1999) Virginia. The voting on both the floor of the Senate and the
House were virtually unanimous on the creation of a separate Chiropractic Board, but as of the filing of
this Complaint nothing more has been heard regarding this project.

financial incentives to limit the scope of practice of competitors like chiropractors, so they have conflicts of interest and bias in making determinations that require decisions about the scope of competition among chiropractors, medical doctors, and doctors of osteopathy.

49.     The Commonwealth of Virginia has not evinced an intention in any way to exclude competition in the provision of healthcare within the state in favor of a particular branch of the healing profession.

50.     The Commonwealth has also not evinced any intent to allow competing medical doctors, podiatrists or osteopaths to determine the scope of practice for chiropractic arts, particularly in an area of competition between these professionals and chiropractors.

**B.     Vitamins and Supplements.**

51.     The Board stated that Plaintiff engaged in unprofessional conduct because she prescribed[23] vitamins and dietary supplements and counseled clients on lifestyle modifications to support the health-related concerns of her patients and to address the underlying causes of Type II diabetes.

52.     To obtain licensure in the Commonwealth of Virginia, a doctor of chiropractic must graduate from a CCE accredited school and pass the National Board of Chiropractic Examiners ("NBCE") parts I-IV examinations.  Such an aspirant must demonstrate proficiency in areas like nutrition, patient diagnosis, lab testing, urine testing, differential diagnosis and appropriate referrals.[24]

---

[23]     Plaintiff prescribed vitamins and supplements to her patients as a written direction for a therapeutic or corrective agent.  These were not prescriptions filled by pharmacies in the way that they fill medical prescriptions.  There are, however, many supplements that are only sold to health care practitioners, like chiropractors, with a valid license, who in turn can, in appropriate instances, provide them to their patients.

[24]     *See* National Board of Chiropractic Examiners (NBCE) Written Examinations-Parts I, II and III and Physiotherapy Booklet, Spring 2013.  Also see NBCE Examinee Information for the Part IV National

53.     Plaintiff's qualifications as a Doctor of Chiropractic with extensive postgraduate training in Functional Endocrinology, Functional Blood Chemistry, Autoimmunity, Functional Immunology, Functional Neurology, Diet, Nutrition and Neurochemistry make her eminently qualified to provide a program of care, including nutritional supplementation, lifestyle changes and dietary counseling to her patients.  This program of care developed for each individual patient, relies on standardized testing through primarily Medicare approved laboratories (both within the Commonwealth of Virginia and in other states) and incorporates blood, saliva, urine, stool, oral, nasal and other laboratory testing.

54.     Plaintiff is also expressly permitted under the Health Regulations 18 VAC 85-20-40.C to recommend and direct patients on the use of diet, food supplements, vitamins and minerals in accordance with the standards of her branch of the healing arts.  These standards require use of laboratory testing for each patient's care based on their health history, symptoms and probable cause(s) of their health conditions.  Plaintiff helped to develop and teach this standard of care through CCE accredited schools to fellow chiropractors as well as other healthcare practitioners.

55.     Plaintiff's assertion at the Board hearing that the effects of Type II diabetes can and have been reversed through making appropriate lifestyle changes and through the systematic administration and use of food supplements and vitamins are clearly supported and endorsed in peer-reviewed articles and scientific publications by eminent physicians and other health practitioners, as well as by several of Plaintiff's patients over the years.  Indeed, just as the medical profession has grown and evolved over the years, so too has the Chiropractic profession. Many Doctors of Chiropractic throughout the country, including plaintiff, employ research-based

---

Practical Examination, February 2013 and the Council of Chiropractic Examiners (CCE) Accreditation Standards, Principles, Processes & Requirements for Accreditation, January 2013.

standards from peer-reviewed journals to dictate practice.  This approach is currently taught in CCE accredited colleges and continuing education courses.

56.     Addressing the cause(s) of diabetes and the subsequent lowering of blood sugar levels normalizes the transmission of nerve energy, which is a hallmark of chiropractic treatment;[25] a traditional chiropractic adjustment is just one of several methods of normalizing the transmission of nerve energy.[26]

57.     Even though Plaintiff never described herself as a "nutritionist" or "dietician" as required under the applicable statute to constitute a violation, Plaintiff by the quality, extent and scope of her training has garnered requisite expertise and qualifications far in excess of that required to practice as a dietitian or nutritionist in Virginia.

58.     The Board's ruling to the effect that Plaintiff may not practice diet and/ or nutrition is not borne out as state policy or clearly articulated by the state legislature, and is contrary to Virginia law as set forth in Virginia Code § 54.1-2730.

59.     The state is not actively engaged in the supervision of this power grab by the medical profession (including Individual Defendants) in the Commonwealth, which has the deleterious and singular objective of eliminating well over 1500 Virginia chiropractors as

---

[25]     Under Va. Code § 54.1-2900, the: " 'practice of chiropractic' means the adjustment of the 24 movable vertebrae of the spinal column, **and assisting nature for the purpose of normalizing the transmission of nerve energy**, but does not include the use of surgery, obstetrics, osteopathy or the administration or prescribing of any drugs, medicines, serums or vaccines." (Emphasis supplied).

[26]     The evolving standard of chiropractic care has far exceeded the mere adjustment of the spine, which is only one way of normalizing the transmission of nerve energy in patients.  Regulating blood sugar (the elevation of which is a well-established cause of neuropathy) normalizes the transmission of nerve energy.  Addressing the underlying cause of thyroid dysfunction will do the same, because nerves and brain tissue require appropriate thyroid hormone exposure to function properly.  Reducing fat deposits around the waist area is a well-accepted treatment for low back pain and affects posture and nerve energy by affecting proprioceptive input from the spine into the brain.  With the ever-changing landscape of the healthcare system, the current practice of chiropractic involves a very complex system of diagnostics, including labs and exams to normalize the transmission of nerve energy.  Diet, exercise, nutrition, food supplements, vitamins and their specific uses are just some examples of aids to assist patients in normalizing nerve energy.

competition for medical and osteopathic physicians (and particularly as primary-care providers) in this particular area of health practice.

### C.   Diagnosis and Management of Chronic Diseases and Interpreting Medical Exams.

60.     Doctors of Chiropractic, as other Primary Care Providers ("PCPs") recognized by most health insurance companies within the healing profession, must order and interpret medical tests, diagnose all conditions of the human body and perform necessary examinations to effectively practice their profession.  Absent these abilities and practices, Doctors of Chiropractic cannot effectively compete with medical doctors for patients.

61.     The Chiropractic Council on Education mandates the performance of case-appropriate physical examinations by chiropractors that involve the evaluation of body regions and organ systems, including the spine and any subluxation/neuro-biomechanical dysfunction that would assist a chiropractic clinician in developing a proper diagnosis.

62.     A chiropractor's training therefore involves conducting diagnostic studies and consultations including imaging, clinical laboratory and specialized testing procedures to collate objective clinical data; formulating diagnosis garnered from a patient's medical history, examination and diagnostic studies; generating problem lists with diagnoses after synthesizing and correlating data from patient history, physical exams, diagnostic tests and other necessary follow-up consultations including making appropriate referral of patients to specialists.  Plaintiff states that this is the essence of practice as a PCP and/or chiropractic primary care provider ("CPCP").

63.     Consequently, prohibiting a chiropractor from interpreting medical tests or performing an examination effectively eliminates chiropractors from practicing in the

Commonwealth of Virginia, and therefore eliminates a competitor for medical doctors in the primary care provider market, and the other alleged relevant markets.

64.     Even for the traditional practice of chiropractic, a chiropractor cannot adjust the vertebrae without a proper examination, case-appropriate laboratory testing, and/or imaging studies to determine which vertebrae do and do not require adjustment.

65.     In Virginia, there is no state policy or legislation disallowing diagnosis(es), the conduct and interpretation of medical tests and the management (of the underlying causes, which is the epitome of chiropractic) of thyroid disease, diabetes and other metabolic diseases by chiropractors.  Nor is there any regulation in Virginia prohibiting chiropractors from practicing as CPCPs, or Chiropractic Primary Care Providers, or PCPs.

66.     Instead, legislation, Chapter 29 of Title 54.1 of the Code of Virginia (§ 54.1-2900) articulates that "'Healing arts' means the arts and sciences dealing with the prevention, diagnosis, treatment, and cure or alleviation of human physical or mental ailments, conditions, diseases, pain or infirmities."

67.     The only limitations on the scope of practice for chiropractors under Virginia law are that they do not practice medicine, surgery, obstetrics, and osteopathy, or administer or prescribe drugs, medicines, serums or vaccines.  Plaintiff never engaged in any of these specifically itemized fields.

68.     Beyond these specifically-itemized fields, the scope of practice for chiropractic is quite broad and overlaps other fields of the healing arts in the areas of the treatment and management of pain, disease prevention, diagnosis, testing and medical exams, diet and the development of an appropriate treatment plan for patients.

69.     Indeed, an opinion emanating from the state's attorney general's office confirms that the scope of practice for chiropractic in the Commonwealth is very broad, and only limited by specifically-excluded fields.[27]

70.     Plaintiff's post-doctoral education and expertise in teaching, training and consulting other healthcare practitioners, as comprehensively documented to the Defendants at the Board hearing, dictates that the use of vitamins, minerals and food supplements based on the results of blood, saliva, stool, urine and other testing are required as the standard of care for chiropractic.

71.     Moreover, the CCE accredited chiropractic degree must include both the didactic and clinical education components of the curriculum and are structured and integrated in a manner that "enables the graduate to demonstrate attainment of all required competencies necessary to function as a primary care chiropractic provider."[28]  As published in the Journal of Chiropractic Medicine in 2002, thirty states allow primary care practice by licensed doctors of chiropractic.  This is based on each of these state's legislation allowing chiropractors to perform all of nine practice criteria necessary to provide primary health care (as defined by the Institute of Medicine). [29]

72.     The unrestrained and pervasive tactic by the Board and Individual Defendants to scuttle the growth and sound development of chiropractic within the Commonwealth of Virginia

---

[27]     *See* opinion of Acting Attorney General, in a letter addressed to the House of Delegates dated June 18, 2001 which stated in part that: "[t]his definition (i.e. Virginia Code § 54.1-2900) expressly excludes certain modalities, but otherwise permits a broad range of practice…" in arriving at the conclusion that physical therapy was within the scope of practice of chiropractic, even though not specifically listed among the treatment modalities available to chiropractors under the Code.

[28]     CCE Accreditation Standards, Principles, Processes & Requirements for Accreditation, January 2013.

[29]     *See United States Chiropractic Practice Acts and Primary Institutes of Medicine Defined Primary Care Practice*, by Richard Duenas, DC, DABCN, Published in Journal of Chiropractic Medicine 2002:Number 4, Volume 1:155-170.

under the guise of regulating the healthcare profession and without legal justification or state backing is not limited to its direct actions against Plaintiff.  For example, the Board and individual defendants, as part of their overall conspiracy, has agreed and implemented action inhibiting doctors of chiropractic from conducting fairly routine Department of Transportation ("DOT") Exams, even though no logical reason supports this position and this practice is federally allowed and endorsed in about 47 states.  Plaintiff would like to offer DOT exams or supervise employees in offering DOT exams, but cannot do so without certain risk of injury because of the Board and Individual Defendants' anticompetitive conduct.

73.     This opinion, which is not supported by applicable law, is another attempt to circumscribe the scope of chiropractic while enlarging the scope of medical practice within the Commonwealth.  These arbitrary limitations imposed on chiropractors by the Board and Individual Defendants constitute an unlawful restraint of trade against chiropractors practicing in Virginia and illegally limits competition between and among healthcare professions in the state. It is further support of Defendants participation in and coordination of a conspiracy to limit competition for medical doctors.

**D.     Class II Low-Level Laser Devices.**

74.     The Board and individual defendants also sanctioned Plaintiff for her and her staff's use of a Zerona™ Laser (a class II low-level laser device or cold laser), even though no Virginia law prohibits the use of such lasers by chiropractors, and there was no evidence that such use constitutes surgery (or any other activity that is actually reserved to medical doctors by Virginia law).

75.     The only previous guidance from the Board available about the use of lasers in the Commonwealth is Newsletter #71, published by the Board in November 2011, which concludes that laser hair removal is not a medical practice or surgery under the current laws

applicable in Virginia.  The Board's contradictory position on low-level laser device use by chiropractors like Plaintiff is, therefore, further evidence of the Board's bias, as well as anticompetitive intent and practices.

76.     The Zerona™ Laser device merely creates a temporary vacuum (a purely biochemical action not involving an actual incision or creation of a physical cavity) through which excess fat is released and metabolized.   The Zerona™ is only a class II low-level laser device and a completely safe non-invasive therapy.[30]

77.     Use of laser devices by chiropractors of similar classification as the Zerona™ is an approved modality for therapeutic purposes and specifically stated as allowable in a number of states including Maryland, California and Colorado.  Other states like Connecticut, Florida, Kansas, Louisiana and Washington simply state that use of "light" is within the scope of chiropractic.  The ACA has also issued guidelines on the scope of practice for the use of low-level lasers by chiropractors.[31]  The NBCE Specialty Exam for Physiotherapy (which Plaintiff passed prior to her licensure) requires knowledge and application of cold laser therapy in order to pass this national specialty exam.[32]

78.     The attempt by the Board and Individual Defendants to exclude chiropractors, and Plaintiff, from the use of benign non-ablative laser devices on the questionable ground that such use constitutes the practice of medicine or surgery within the Commonwealth is yet another attempt to illegally appropriate this business and practice area as the exclusive preserve of the

---

[30]     An FDA letter of approval for the Zerona™ Laser device under classification II of August 24, 2010 states that: "A Low Level Laser System for Aesthetic Use is a device using low level laser energy for the disruption of adipocyte cells within the fat layer for the release of fats and lipids from these cells for non-invasive aesthetic use."  *See* 21 C.F.R. § 878.5400.
[31]     American Chiropractic Association Guide for Insurance Professionals, published in 2010.
[32]     NBCE Written Exam Booklet, at pg. 33 shows that cold laser therapy is an included modality and knowledge of, implementation and use thereof is required to pass the NBCE Specialty Exam in Physiotherapy.

medical profession, when it (1) has been approved by nationwide organizations for use by chiropractors, (2) is approved for use by chiropractors by several of the relevant state licensing boards throughout the United States, and (3) no Virginia law or regulation has been passed to authorize the Board and Individual Defendants to make such decisions to exclude such competition by chiropractors from medical doctors.

### E.    Proscription of Plaintiff's Business Advertising and Training.

79.    The Board's order also proscribes Plaintiff's ability to lawfully and truthfully advertise her business and professional training which she has assiduously acquired and unreasonably interferes with Plaintiff's ability to practice her profession and earn her livelihood.

80.    The putative regulation of Plaintiff's business advertising without just cause and beyond the scope of any proper regulation of the health profession constitutes an undue and unreasonable restraint of trade in contravention of both state and federal antitrust laws. Moreover, the Board and Individual Defendants' actions harm competition by diminishing both the choices and perceived choices for consumers considering treatment in the relevant service markets.

## III.   CHIROPRACTORS ARE A COMPETITIVE THREAT TO MEDICAL DOCTORS

81.    As at December 2012, the following chart provides an outline of pertinent doctors licensed to practice in the Commonwealth of Virginia with corresponding complaint rate and subsequent disciplinary rates (sanctions and violations) by the Defendant.[33]

| Doctor Type | # Licensed * | Complaints** | Sanctions ** | Violations ** |
|---|---|---|---|---|
| Chiropractic | 1,593 | 37.5 | 15.5 | 7.1 |
| Medicine | 33,383 | 39.8 | 8.8 | 4.3 |
| Osteopathy | 2,250 | 38.7 | 13.8 | 5.2 |

---

[33]    Data culled from the Department of Health Professions Biennial Reports for fiscal years 2007-2008, 2009-2010 and 2011-2012.

*As of Department of Health Professions' fiscal year end June 30, 2013.   ** Number of incidents per
1,000 licensees.  Determined by averaging the rates for six fiscal years from July 1, 2006- through June 20, 2012.
.

82.	The data reproduced above discloses a disturbing asymmetry in the proportion of

doctors of chiropractic disciplined in the Commonwealth of Virginia vis-à-vis doctors of

medicine and osteopathy in Virginia who appear to be in favor with the Board.  Ironically, the

complaint rate against doctors of chiropractic are the lowest of the three doctor types, yet both

the sanction and violation rates found by the Board are the highest for doctors of chiropractic.

These statistics also support the fact that the Board and Individual Defendants are biased against

chiropractors, which is consistent with the financial incentive medical doctors and other

competitors of chiropractors have to limit the scope of chiropractic.  Limiting the scope of

chiropractic limits the overlap of services that chiropractors and medical doctors provide to the

same set of patients.

83.	The cumulative impact of systematically denying chiropractors, including

Plaintiff, the ability to prescribe vitamins and nutrition supplements, conduct medical

examinations, order and interpret tests results, or to use benign low-level laser devices and

practice as CPCPs (or primary care providers) is to effectively put the chiropractors who have

been licensed in Virginia, including Plaintiff, out of business, apparently with the sole objective

of having medical doctors (and other competitors of chiropractors) benefit from the commercial

gap in the need for primary care providers that would result from the Board and Individual

Defendants' unlawful and illegal conduct.

84.	The fact is that Virginia medical doctors view chiropractors as a competitive

threat.  Instead of limiting competition to the merits, the Virginia Medical Board and Individual

Defendants respond to its primary constituency by limiting chiropractors' (including Plaintiff)

scope of practice in areas where medical doctors and chiropractic doctors would otherwise

compete.

85.     In the current climate of outrage over medical costs, chiropractors, who generally charge less than and provide a wider range of services (including CAM) than medical doctors, become an even greater competitive threat to medical doctors.

86.     Indeed, the lower-cost threat to medical doctors from chiropractors has recently accelerated and, absent the Board and Individual Defendant's anticompetitive conduct, will continue to accelerate to the benefit of consumers and other medical-cost payers.  This competitive threat results in part from the increased nationwide acceptance of chiropractors as primary care providers or CPCPs.  Medical doctors, including the Board and its members, seek to forestall this development from occurring in Virginia by curtailing the right of chiropractors like Plaintiff from offering services that directly compete with primary care providers in Virginia.

87.     A pivotal seven (7) year study in Illinois has shown, however, that the ability of chiropractors to practice as CPCPs results in a marked reduction in hospital admissions, hospital stays, out-patient surgeries and related procedures and costs of prescription medications compared to when reliance is placed exclusively on conventional PCPs.   Furthermore, and according to the referenced study, the disease profile of Alternative Medicine Integration's (AMI's) Integrative Independent Physicians Association (IPA) in Metropolitan Chicago, as a percentage of samples with diagnosis between 2000 (n= 491) and 2005 (n=1511) was as follows:[34]

---

[34]     *See Clinical Utilization and Cost Outcomes From An Integrative Medicine Independent Physician Association: An Additional 3-Year Update* by Richard L. Sarnat, MD; James Winterstein, DC and Jerrilyn A. Cambron, DC, PhD., Published in Journal of Manipulative Physiotherapy 2007;30:263-269.

| Diagnosis | In 2000 (%) | In 2005 (%) |
|---|---|---|
| Wellness | 28.5% | 23.4% |
| Orthopedic | 23.5% | 16.7% |
| Other medical | 11.7% | 5.6% |
| Mental health | 8.1% | 3.4% |
| Gynecologic | 6.7% | 7.3% |
| Sinus/Allergy | 6.0% | 3.4% |
| Cardiac/Hypertension | 4.6% | 3.3% |
| Headaches (all variations) | 2.7% | 2.7% |
| Neoplastic | 1.5% | 1.4% |
| Upper respiratory tract infection | 1.5% | 14.6% |
| Asthma | 1.4% | 1.4% |
| Gastrointestinal | 1.3% | 5.0% |
| Thyroid disease | 1.2% | 0.7% |
| Diabetes | 1.2% | 0.7% |
| Dermatology | Not available | 5.6% |
| Genital/Urinary | Not available | 1.4% |
| Ocular | Not available | 1.4% |
| Chronic fatigue syndrome | Not available | 1.0% |
| Trauma | Not available | 1.0% |

[Note that the listed health problems are some examples of areas in which chiropractic intervention has been recorded and found to be very effective]

88.     The net positive impact of allowing chiropractors in the Commonwealth of

Virginia to practice as CPCPs, or primary care providers, (without fear of retaliation from the

Board) will result in reduced co-pays for medications, surgery, hospital stays, length of hospital

stays, and an overall improvement in the quality of life for patients.  Employers would see a

marked reduction in yearly work hours lost, and drastic reductions in disability payments and

insurance costs.  Insurance companies would see a reduction in the cost of prescription

medications, a reduction in the cost of surgery (for both in and out-patient surgeries), a reduction

in hospital stays, and a reduction in the number of needed surgical procedures actually performed

annually.  This also entails a reduction in premium payments and deductions for both employers

and employees within the state. Counties in the Commonwealth of Virginia with insufficient

number of PCPs will have a substantial portion of their health care needs met if chiropractors

were allowed to join the ranks (again, without fear of retaliation from the Board and individual

defendants) of osteopathic and medical doctors currently practicing as PCPs in those areas.

Currently, and even with an estimated 24,193 osteopaths and medical doctors in active practice,

at least 78 out of 144 counties and independent cities in Virginia (54.2 percent) continue to

experience primary care shortage both in terms of geographic spread and the availability of PCPs

across the population (Health Care Professions – Primary Care Physician – shortage areas).[35]

| 2011 | 2011 cost | % of total budget | 2011 cost per person * | AMI Study CPCP ** Reduce % | Cost Savings per patient: | Savings with 200,000 Patients Switch to CPCP *** | Savings with 300,000 Patients Switch to CPCP *** |
|---|---|---|---|---|---|---|---|
| Inpatient Hospital Stays | $910.7 million | 12.7 | $917.30 | Hospital Admissions 60.2 | $552.22 | $110.44 Million per year | $165.67 Million per year |
| Pharmacy | $168.2 million | 2.3 | $169.42 | Pharmaceutical Costs 80.5% | $136.38 | $27.28 Million per year | $40.91 Million per year |

*992,800 people enrolled in Medicaid in 2011 ** Chiropractic Primary Care Provider   ***Projection of 100 Virginia DCs Practicing as PCPs managing 2,000 or 3,000, respectively, patients each (calculated by percent of 992,800 recipients that switch to CPCP multiplied by cost savings per patient.)

89.     From the conservative projections above, both the Commonwealth of Virginia

and the Federal government combined could save between $137.72 and $206.58 million per year

on Medicaid expenditures <u>alone</u>, which generally pays the lowest allowable amount of any

healthcare coverage.  This projection does not even factor in other cost savings that could accrue

to Virginia as a result of the reduction in hospital stays and unnecessary pharmaceutical costs,

which are not prescribed by chiropractic doctors.

---

[35]     Data culled on 8/11/13 from the US Department of Health and Human Resources Health Services and Resources Administration (www.hhs.gov).

IV.  **THE BOARD'S ANTICOMPETITIVE CONDUCT HARMED INTERSTATE COMMERCE**

90.  Defendants' conduct and agreements were intended to and did substantially harm and affect a substantial amount of interstate commerce.

91.  Health care activity within the states, including Virginia, is inextricably intertwined.  For example, health-care providers purchase products for their services from other states, and insurance companies located throughout the fifty-states often pay for these services. Indeed, as the national debate over healthcare and Obama-care recognizes, healthcare costs and services are a national problem, regardless of the proposed solutions.

V.  **THE RELEVANT PRODUCT AND GEOGRAPHIC MARKETS AND MARKET POWER**

92.  The relevant service markets for purposes of this action are (1) therapeutic and aesthetic treatments with Class II Low-Level Laser devices; (2) diagnosis, management, and treatments of Type II diabetes and its underlying causes; (3) diagnosis, management, and treatments for thyroid diseases; (4) diagnosis, management, and treatments for metabolic disease; and (5) Primary Care Provider or CPCP services (collectively, with the relevant geographic market, the "relevant service markets").

93.  The relevant geographic market for each of these relevant service markets is the Commonwealth of Virginia.  Competing medical service providers, including chiropractors and medical doctors, must be licensed in Virginia to practice in Virginia.  The vast majority of patients do not travel out-of-state for each of the relevant service markets, and would not travel out-of-state in reaction to a sustained price increase.

94.  Chiropractors, including Plaintiff, compete with medical doctors to perform therapeutic and aesthetic treatments with Class II Low-Level Laser devices.  Plaintiff only discontinued these treatments upon the advice of her attorney, as she faced further disciplinary

action, including suspension and fines, from the Board.  Absent the Board and Individual

Defendants' anticompetitive conduct, Plaintiff would continue to perform these treatments,

which are not prohibited under Virginia law.

95.     Chiropractors, including Plaintiff, also compete with medical doctors to diagnose,

manage, and treat Type II diabetes and its underlying causes.  Plaintiff and other chiropractors do

so through diet, nutrition, and lifestyle counseling.  Absent the anticompetitive conduct of the

Board and Individual Defendants, Plaintiff and other chiropractors would continue to diagnose,

manage, and treat the underlying causes of Type II diabetes, all of which are not prohibited under

Virginia law.

96.     Chiropractors, including Plaintiff, also compete with medical doctors to diagnose,

manage, and treat thyroid disease.  Plaintiff and other chiropractors do so, in part, by ordering

medical tests and conducting examinations.  Absent the anticompetitive conduct of the Board

and Individual Defendants, Plaintiff and other chiropractors would continue to diagnose,

manage, and treat the underlying causes of thyroid disease, all of which are not prohibited under

Virginia law.

97.     Chiropractors, including Plaintiff, also compete with medical doctors to diagnose,

manage, and treat metabolic disease.  Plaintiff and other chiropractors do so, in part, by ordering

medical tests and conducting examinations.  Absent the Board and Individual Defendants'

anticompetitive conduct, Plaintiff and other chiropractors would continue to diagnose, manage,

and treat the underlying causes of metabolic disease, all of which are not prohibited under

Virginia law.

98.     The Virginia Medical Board and Individual Defendants have and exercise the

power to exclude medical doctors, chiropractors and others from competing in the relevant

service markets. The Board and Individual Defendants have the power and perceived power to suspend chiropractic licenses, issue fines, and order chiropractors and others to take or refrain from certain conduct. Thus, the Board and Individual Defendants have the power, which they have exercised here, to exclude competition within the relevant service markets.

## VI. THE VIRGINIA BOARD OF MEDICINE AND INDIVIDUAL DEFENDANTS ENGAGED IN ANTICOMPETITIVE CONDUCT

99. The Defendant Board of Medicine and Individual Defendants are colluding to exclude chiropractors and non-medical doctor personnel from competing with medical doctors in the relevant service markets. These actions in turn increase prices, reduce the supply of services, and reduce consumer choice in the relevant service markets without any legitimate justification, defense, or efficiencies. They also reduce the overall quality of services that customers receive from health care providers.

100. For example, Defendants conspired to forbid and deter Plaintiff and other chiropractors from using a Class II Low-Level Laser device in their practice for the purpose of eliminating competition in one or more relevant service markets. Indeed, Plaintiff herself was ordered by the Board and Individual Defendants to cease and desist from using that device, despite the fact that using such a device is within scope of chiropractic and not prohibited or restricted under Virginia law or the Board's own regulations.

101. Defendants prevent and deter chiropractors from using these low-level laser devices despite the fact that Virginia law neither reserves the right to use these devices to medical doctors only, nor prohibits Virginia chiropractors from using them. This device does not result in an actual incision or the creation of a physical cavity; in fact the FDA defined this laser as non-invasive, and using this device does not constitute the practice of medicine or surgery under any Virginia law.

102.    In fact, these devices are commonly used by chiropractors throughout the country, and several states even explicitly include them as within the scope of chiropractic.  Moreover, the ACA has issued guidelines on these lasers for chiropractors, and the NBCE Specialty Exam for Physiotherapy—which Plaintiff passed prior to licensure—requires knowledge and application of this cold laser therapy to pass this specialty exam.

103.    The result and intent of the Defendants' actions in prohibiting Plaintiff and other chiropractors from using the class II low-level laser device is to remove and eliminate Virginia competition for medical doctors from chiropractors and others in the use of these devices and for treating the conditions that these devices treat.  This conduct has restrained competition and injured consumers by limiting the supply of laser-device services, thus increasing prices and reducing choice for consumers.  Moreover, the Board and Individual Defendants' actions in restraining competition for the use of low-level laser devices lack any legitimate efficiency or pro-competitive justifications, and such actions are not supported under Virginia law.

104.    Defendants have also conspired to forbid and deter Plaintiff and other chiropractors from treating the underlying causes of Type II diabetes and other conditions through diet, nutrition, and lifestyle counseling.  Indeed, Plaintiff was ordered by Defendants on February 28, 2013 to cease these treatments.

105.    The Board and Individual Defendants prevent and deter chiropractors from treating Type II diabetes and other conditions through diet, nutrition, and lifestyle counseling despite the fact that Virginia law neither reserves the right to treating these conditions to medical doctors, nor prohibits chiropractors from treating these conditions.  Indeed, Plaintiff is expressly permitted under the Health Regulations VAC 18 85-20-40.C to recommend and direct patients regarding the use of diet and food supplements and the use of vitamins and minerals in

accordance with the standards of her branch of the healing arts.

106.    To obtain a Virginia chiropractic license, a doctor of chiropractic must graduate from a Chiropractic Council on Education accredited school and pass the National Board of Chiropractic Examiners parts I-IV examinations.  These standards, in fact, require the aspiring doctor of chiropractic to demonstrate proficiency in areas like nutrition, patient diagnosis, lab testing, urine testing, and differential diagnosis.  Thus, the standards for licensure in Virginia—and therefore Virginia law—entail qualifications to treat certain conditions through nutrition, testing, and diagnosis.  Under Virginia law, chiropractors compete with doctors for the treatment of certain conditions, like Type II diabetes.

107.    Moreover, the treatment of Type II diabetes normalizes the transmission of nerve energy—a hallmark of chiropractic treatment—by lowering blood sugar levels.

108.    Defendants' actions in preventing and deterring chiropractors from treating Type II diabetes and other health conditions through diet, nutrition, and lifestyle counseling has the intent and effect of limiting competition from chiropractors to medical doctors for the treatment of these conditions.  These actions have restrained competition and injured Virginia consumers by limiting the supply of services for these conditions, thus increasing prices and reducing choice for consumers.  The use of nutrition, diet, and supplements to treat various conditions is a growing and potentially profitable area of treatment by medical doctors, so the Board and Individual Defendants have a particularly strong incentive to limit and eliminate direct competition from chiropractors.  Moreover, Defendants' actions in restraining competition for these services lack any legitimate efficiency or pro-competitive justification, as well as any justification under Virginia law.

109.    Defendants have also conspired to limit and eliminate direct competition from

chiropractors for medical doctors by prohibiting Plaintiff and other chiropractors from ordering

medical tests or conducting examinations for the treatment of thyroid disease, diabetes, and

metabolic disease.  Indeed, the Board—made up of primarily medical doctors, including the

Individual Defendants—specifically held in its Order suspending Plaintiff's license that

chiropractic in Virginia cannot include "the diagnosis, management, or treatment of thyroid

disease, diabetes, metabolic disease, or interpreting tests or examinations."  Nor, ordered the

Board, can a chiropractic practice include the "prevention, diagnosis and treatment of human

physical or mental ailments, conditions, diseases, pain or infirmities by any means or method."

In other words, the Board and Individual Defendants, without any legal authority, seek to reduce

competition from licensed chiropractors by reserving the prevention, diagnosis and treatment of

any of these conditions as a monopoly for themselves.  These pronouncements will have the

intended effect of deterring and prohibiting non-medical doctors from engaging in these

activities.

110.    Virginia law does not prohibit chiropractors from preventing, diagnosing, or

treating thyroid disease, diabetes, metabolic disease, incorporating CAM or interpreting tests or

examinations.  Virginia law also does not prohibit chiropractors from preventing, diagnosing,

and treating human physical and mental ailments, conditions, diseases, pain or infirmities.  Nor

does Virginia law carve out to medical doctors a monopoly to prevent, diagnose, and treat these

physical and mental ailments, conditions, diseases, pain or infirmities (practicing as a Primary

Care Provider, or CPCP).  The legal limitations under Virginia law on the scope of practice for

chiropractors are that they do not practice medicine, surgery, obstetrics, and osteopathy, or

administer or prescribe drugs, medicines, serums or vaccines. *See* Virginia Code § 54.1-2900.

Defendants conspired to expand these limitations to other areas, previously permitted under

Virginia law, with the purpose and effect of limiting and eliminating competition from chiropractors.

111.    In fact, these activities—the prevention, diagnosis, and treatment of physical and mental ailments—fall within the traditional scope of chiropractic, and the Commonwealth of Virginia has specifically reserved these activities to practitioners of the healing arts, one of such being chiropractors. [*See* Chapter 29 of Title 54.1 of the Code of Virginia (§ 54.1-2900) and most specifically § 54.1-2903].  Virginia legislation expressly allowed these activities to chiropractors licensed in Virginia, until the Board's Order against Plaintiff prohibited chiropractors from doing so, in *defiance of and unbeknownst* to the Virginia legislature.  To illustrate, the CCE actually mandates case-appropriate physical examinations by chiropractors that involve evaluating body regions and organ systems, to assist the chiropractor in developing a proper diagnosis.  Moreover, a chiropractor's training involves conducting diagnostic studies and consultations (including imaging clinical laboratory and specialized testing procedures) to collate objective clinical data; formulating diagnosis from a patient's medical history, examination, and diagnostic studies; generating problem lists with diagnoses after synthesizing and correlating data from patient history, physical exams, diagnostic tests and other necessary follow-up consultations.  These are the hallmarks of practice as a PCP or CPCP primary care provider.

112.    Defendants' conspiracy to harm competition is not limited to its actions against Plaintiff—and the resulting direct and deterrent effects of those actions.  Plaintiff is merely one significant victim of the conspiracy.  For example, on September 9, 2013, Defendants issued an Order against another chiropractor forbidding him from performing comprehensive physical examinations for commercial driver's license ("Department of Transportation Exams").  Defendants did so even though federal law and other states expressly permit chiropractors to

perform these examinations and Virginia law does not prohibit them from doing so.  Defendants, once again, conspired to reserve a monopoly for these exams in Virginia to medical doctors.

113.    The Board and Individual Defendants interfered with Plaintiff's contracts, prospective contracts, and prospective business opportunities by violating Directors' Policies in posting the sanction against Plaintiff before Plaintiff's time to appeal had expired, and in failing to include notice that Plaintiff had indeed appealed the decision.  This action by Defendants had the predictable, foreseeable, and intended result of prompting an avalanche of claims and investigations by former clients, third-party insurers, and the federal government relating to past paid insurance claims and payments for legitimate services.  These claims for reimbursement and refunds have and will create substantial financial, reputational, and irreparable injury to Plaintiff and her business.  Defendants' communication harmed competition itself, not only by harming a significant competitor, but by deterring other chiropractors from competing with medical doctors and doctors of osteopathy, as the harm from defendants' improper and illegal communication predictably injures a targeted business beyond repair.  Defendants' communication also unlawfully interfered with Plaintiffs' contracts, prospective contracts, and prospective economic advantage.

114.    The Board and Individual Defendants additionally interfered with Plaintiff and other chiropractors' ability to compete in the relevant markets by advising third-party clinical laboratories not to do business with chiropractors in Virginia based upon the Defendants' false representations that Virginia law prohibits these chiropractors from contracting with these laboratories to run certain tests.  Running these tests is necessary for chiropractors in Virginia to compete with doctors in the relevant markets.  For example, after requesting that Fry Laboratories, LLC run certain tests for Plaintiff's client, Fry Laboratories responded to Plaintiff

that the Virginia State Board of Medicine advised Fry Laboratories that running these tests for

Virginia chiropractors violated Virginia State law.  Based upon these false representations by the

Board and Individual Defendants, Fry Laboratories declined to do business with Plaintiff.  Thus,

by using the false color of state law to advise third-parties not to deal with chiropractors in

Virginia, Defendants engaged in anticompetitive actions, including boycott activity, that directly

harmed competition and Plaintiff.

## VII.   ANTITRUST INJURY

115.    Without effective relief, the exclusionary conduct by the Board and Individual

Defendants continue.  As a result of the Defendants' conduct, the availability of services for

consumers in the relevant service markets has been and will be significantly diminished.

Defendants' conduct will have the intended effect of deterring and prohibiting non-Medical

doctors from offering services in the relevant service markets.  Chiropractors, including Plaintiff,

are unable to compete in these markets, despite the fact that consumers seek their services, and

seek alternatives to medical doctors.  As a result of this diminished competition, consumers will

pay higher prices for services in the relevant service markets, and have fewer provider or primary

care provider choices.  They will also receive lower-quality care.

116.    Innovation in the relevant service markets will also suffer as an entire profession,

chiropractic, is unable to offer its unique perspective on treating a wide-range of conditions.

Indeed, as evident by the medical profession's attempt to eliminate chiropractic over the years,

chiropractic professionals are "maverick" and "disruptive" competitors to medical doctors that

require medical doctors to compete more efficiently and effectively to win the business of

consumers.  Without chiropractic competition as primary-care providers, medical doctors can

continue to follow a predictable and complacent course of treatment with minimal competitive

interruption.  Thus, the quality of services provided by primary care providers will also diminish

and has diminished without chiropractic competition.

117.    Ultimately, by foreclosing competition, Defendants' conduct increases prices and reduces the quality and quantity of options for consumers in the relevant service markets.

118.    Defendants' exclusionary conduct directly harmed Plaintiff by foreclosing and precluding Plaintiff from competing with medical doctors in the relevant service markets. Plaintiff has sustained and will continue to sustain significant economic and financial loss from Defendants' anticompetitive conduct.  First, she is unable and will continue to be unable to treat customers within the relevant service markets.  Second, the Board and Individual Defendants caused Plaintiff's chiropractic license to be suspended for at least six months (already effective), so she is unable to treat any chiropractic patients during that time.  Third, the Board ordered Plaintiff to pay $25,000.  Fourth, as a result of Defendants' conduct, Plaintiff can only practice chiropractic if she agrees not to compete with medical doctors in the relevant service markets, although there is no Virginia law to support this exclusionary position.  Fifth, the Board and Individual Defendants ordered Plaintiff to harm her own reputation (and future business) by sending certified letters to all current patients notifying them that her license is suspended. Defendants also ordered Plaintiff to provide similar notifications to all hospitals and other medical facilities where she is granted privileges, and to all insurance companies that reimburse her for any of her services.  Sixth, the Plaintiff sold her Zerona laser at a loss and sustained loss of income from this revenue stream as a direct consequence of Board's orders.  Seventh, the Board damaged Plaintiff's reputation and business by posting the February 28, 2013 Order in defiance of the Department of Health Profession Director's Policy # 76-3.1.  Seventh, insurance companies, including the federal government, are have demanded that Plaintiff return amounts previously paid by these companies as a direct result of defendants' conduct.  Eighth, previous

patients are demanding refunds from Plaintiff as a result of Defendants' conduct. Ninth, insurance companies, including the federal government, have threatened Plaintiffs' ability to obtain reimbursement in the future for legitimate insurable services to her patients. These injuries to Plaintiff result from the anticompetitive nature of Defendants' conduct, which resulted from Plaintiff's lawful competition with medical doctors and other primary care providers.

119.     The severity of Defendants' conduct also chills possible future competition for medical doctors from chiropractors and others within the relevant service markets. Indeed, the Board and Individual Defendants intentionally sought to make an example of Plaintiff to deter other chiropractors and alternative care providers from competing with medical doctors, including Individual Defendants, in Virginia. Absent an order from this Court, both Plaintiff and competition in the relevant service markets will continue to suffer harm arising out of Defendants' anticompetitive conduct.

## VIII.   STATE ACTION IMMUNITY

120.     The Defendant Virginia Board of Medicine is not a sovereign-state entity within the federal system, but instead is a quasi-public, quasi-private entity that is made up primarily of medical doctors who compete with Plaintiff. These medical doctors are participants or potential participants in the relevant markets.

121.     Defendants may not invoke state-action immunity for its anticompetitive conduct because the conduct was not clearly articulated and affirmatively expressed as state policy, and is not actively supervised by the Commonwealth of Virginia. To the contrary, Defendants' conduct contravenes Virginia law. Neither the Commonwealth of Virginia, nor its laws, contemplate that the Board, consisting primarily of medical doctors, could or would eliminate competition for these and other medical doctors from professionals like chiropractors in areas where chiropractors have commonly practiced, such as being recognized as primary care providers.

Defendants' conduct cannot be attributed to the sovereign state—it was instead the independent result of the Board acting through Board members, with pecuniary interests in restricting competition from chiropractors and other non-medical doctors.  The Individual Defendants are market participants that compete with Plaintiff and Virginia chiropractors and have economic incentives and interests in narrowing the scope of chiropractic practice.

## CLAIMS FOR RELIEF

### Count 1
### Violation of Section 1 of the Sherman Act
### (All Defendants)

122.    Plaintiff incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 121.

123.    Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, because The Board, along with Individual Defendants, entered an agreement to allocate the entire relevant service markets, including the number of Primary Care Providers that could operate in Virginia, to medical doctors, and excluded and foreclosed chiropractors, including Plaintiff, from competing in those markets.  The agreement and conspiracy included Defendants' decision to sanction Plaintiff for competing with medical doctors in the relevant markets (including the February 28, 2013 Order), but also included conduct distinct and separate from that decision.  For example, the agreement and conspiracy also included Defendants' efforts to inappropriately publicize their sanction before the state appeal was completed to enhance the deterrence effects of their conduct on other chiropractors, Defendants' efforts to deter and restrain chiropractors (including Plaintiff) from offering DOT exams, and Defendants' inappropriate interference with Plaintiff and chiropractors' ability to order appropriate tests throughout third-party testing facilities.

41

124.     Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act because it involves a horizontal agreement among competitors to allocate markets and exclude competitors, including Plaintiff, from the relevant service markets.

125.     In the alternative, Defendants' conduct violates Section 1 of the Sherman Act under the rule of reason, or quick-look analysis.

126.     Defendants have sufficient market and monopoly power over the relevant service markets to appreciably restrain free competition in these markets.

127.     Defendants' conduct and agreements harm competition in the relevant service markets by excluding chiropractors, including Plaintiff, from competing within them.  Moreover, Defendants' conduct and agreements discourage all non-medical doctors from competing within those markets.

128.     Defendants also engaged in a group boycott against Plaintiff. Defendants and Plaintiff are all horizontal competitors in the relevant markets. As part of defendants' agreement and conspiracy, defendants communicated with third parties that do business with Plaintiff or might do business with Plaintiff, and convinced them not to do business with Plaintiff. Defendants' conduct harmed Plaintiff because Plaintiff's inability to do business with third-party testing facilities and insurance companies, for example, make it impossible to compete with defendants in the relevant markets.

129.     Defendants' conduct and agreements have and will, as a result, increase prices and decrease the quality and quantity of services in the relevant service markets.

130.     As a result of Defendants' anticompetitive conduct, Plaintiff has been and will continue to be injured through significant economic and financial loss, the loss of current and future business, reputational damage, and the inability or difficulty to seek reimbursement

through third-party insurers.  Thus, Plaintiff has suffered antitrust injury from Defendants'

anticompetitive conduct, which has harmed both competition and Plaintiff.

131.    Defendants' conduct and agreements was intended to and did substantially harm

and affect a substantial amount of interstate commerce.

132.    Defendants' conduct and agreements do not qualify for state action immunity, nor

are they reasonably related to any efficiencies or other benefits sufficient to justify their harmful

effects on competition in the relevant service markets.  The anticompetitive harm from

Defendants' conduct and agreements substantially outweigh the non-existent efficiency and

competitive benefits.

133.    Plaintiff is entitled to recover treble damages under Section 4 of the Clayton Act;

15 U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## Count 2
## Violation of Intentional Interference with Existing Contracts under Virginia State Law
## (Individual Defendants)

134.    Plaintiff incorporates by reference as though fully set forth herein the allegations

in paragraphs 1 through 133.

135.    Plaintiff has, or had, a valid contractual relationship or business expectancy with

her clients, with insurance companies, with third-party testing companies, and with government

agencies or programs, such as Medicare, all with a probability of future economic benefit to

Plaintiff.

136.    The Individual Defendants are competitors and potential competitors of Plaintiff

in the relevant markets, and knew and continue to know of the existence of Plaintiff's valid

business relationships and expectancies.

137.    The Individual Defendants intentionally interfered with Plaintiff's existing

contracts, thereby inducing or causing a breach or termination of the relationship or expectancy. Defendants interfered in numerous ways, including anticompetitive conduct, improper communication with third-parties that contract with Plaintiff and improper publicizing of the Board decision sanctioning Plaintiff (despite the pendency of Plaintiff's appeal and Virginia laws and policies that prohibit Defendants' conduct).

138.    The Individual Defendants' actions against Plaintiff were not legal and have damaged Plaintiff and disrupted her relationship or expectancy with existing contracts.

139.    The Individual Defendants' actions were and are without privilege or justification and were engaged in through improper means.

140.    It is reasonably certain that, absent the Individual Defendants' intentional misconduct, Plaintiff would have continued in her contracts or realized her expectancy of future economic benefit.

141.    As a result of the Individual Defendants' conduct, Plaintiff's goodwill with her clients has been diminished, and the Individual Defendants have diverted—and will divert—future business to the Individual Defendants and other medical doctors that would have gone to Plaintiff.

142.    The foregoing conduct by the Individual Defendants constitutes intentional interference with Plaintiff's contracts, and a disruption of Plaintiff's relationship or expectancy, under Virginia common law.

143.    As a consequence of the foregoing, Plaintiff has been and continues to be damaged by the actions of the Individual Defendants, and Plaintiff seeks damages and injunctive relief against the Individual Defendants.

## Count 3
## Violation of Intentional Interference with Prospective Contracts under Virginia State Law
## (Individual Defendants)

144.    Plaintiff incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 143.

144.    Plaintiff has the expectancy of prospective contracts with her existing and future clients, with insurance companies, with third-party testing companies, and with government agencies or programs, such as Medicare, all with a probability of future economic benefit to Plaintiff.

145.    The Individual Defendants are competitors and potential competitors of Plaintiff in the relevant markets, and knew and continue to know of the existence of Plaintiff's prospective contracts.

146.    The Individual Defendants intentionally interfered with Plaintiff's existing expectancy of prospective contracts, and have used improper, sometimes illegal, means or methods to interfere with Plaintiff's expectancy of prospective contracts.  Defendants interfered in numerous ways, including anticompetitive conduct, improper communication with third-parties with prospective contracts with Plaintiff and improper publicizing of the Board decision sanctioning Plaintiff (despite the pendency of Plaintiff's appeal and Virginia laws and policies that prohibit Defendants' conduct).

147.    The Individual Defendants' actions against Plaintiff were not legal and have damaged Plaintiff and disrupted her relationship or expectancy of contracts.

148.    The Individual Defendants' actions were and are without privilege or justification and were engaged in through improper means.

149.    It is reasonably certain that, absent the Individual Defendants' intentional

misconduct, Plaintiff would have realized her expectancy of future economic benefit.

150.    As a result of the Individual Defendants' conduct, Plaintiff has been and continues to be damaged by the disruption of her contract expectancy.

151.    The foregoing conduct by the Individual Defendants constitutes intentional interference with Plaintiff's prospective contracts under Virginia common law.

152.    As a consequence of the foregoing, Plaintiff has been and continues to be damaged by the Individual Defendants' actions, and Plaintiff seeks damages and injunctive relief against the Individual Defendants.

**Count 4**
**Violation of Intentional Interference with Prospective Economic Advantage under Virginia State Law**
**(Individual Defendants)**

153.    Plaintiff incorporates by reference as though fully set forth herein the allegations in paragraphs 1 through 152.

154.    Plaintiff has developed a successful business that has had business relationships or expectancies with a probability of future economic benefit to Plaintiff.

155.    The Individual Defendants are competitors and potential competitors of Plaintiff in the relevant markets, and they had knowledge of Plaintiff's business relationships or expectancies, including her designation of a primary-care provider for an increasing number of patients.

156.    The Individual Defendants intentionally interfered with Plaintiff's prospective business or caused the breach or termination of the relationship or expectancy.  Indeed, the Individual Defendants have used improper, sometimes illegal, means or methods to interfere with Plaintiff's expectancy and relationships.  Defendants interfered in numerous ways, including anticompetitive conduct, improper communication with third-parties with prospective

contracts with Plaintiff and improper publicizing of the Board decision sanctioning Plaintiff (despite the pendency of Plaintiff's appeal and Virginia laws and policies that prohibit Defendants' conduct).

157.     Based upon Plaintiff's past business, there is a reasonable certainty that, absent the Individual Defendants' intentional misconduct, Plaintiff would have continued in the relationship or realized the expectancy.

158.     Individual Defendants' conduct therefore constitutes intentional interference with Plaintiff's prospective business or economic advantage under Virginia common law.

159.     The Individual Defendants' actions were and are without privilege or justification and were engaged in through improper means.

160.     As a consequence of the foregoing, Plaintiff has been and continues to be damaged by the actions of the Individual Defendants,' and Plaintiff seeks damages and injunctive relief against the Individual Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Dr. Yvoune Kara Petrie, DC prays for the following relief:

1.     That the Court adjudge and decree that the Order issued by the Defendant Board against the Plaintiff on February 28, 2013 be set aside in its entirety as constituting an unlawful restraint of interstate trade and commerce and Plaintiff's ability to freely practice her trade and profession as a doctor of chiropractic, in violation of Section 1 of the Sherman Act.

2.     That this Court enjoin Defendants from limiting the scope of chiropractic practice beyond the limitations provided under Virginia law.

3.      That this Court enjoin Defendants from taking further action, outside of their adjudicatory role, from deterring and preventing chiropractors from practicing chiropractic as permitted by Virginia law.

4.      That this Court enjoin Defendants from conspiracy and agreeing to unlawfully restrain trade and allocate markets in favor of individual defendants and medical doctors and against Plaintiff and chiropractors.

5.      That this Court enjoin Defendants from further interference with Plaintiff's contracts, prospective contracts, and prospective business or economic advantage relating to patients and prospective patients, third-party medical testing companies, and third-party insurers, except as provided and required by Virginia law.

6.      That the Defendants be permanently enjoined from interfering with Plaintiff's business and ability to practice her profession in accordance with applicable laws and to cease from taking any further steps in furtherance of the anticompetitive conduct alleged in this complaint.

7.      That Plaintiff is entitled to recover:

(a)      Treble the damages determined by this Court to have been sustained by her on account of Defendants' anticompetitive conduct.

(b)      Damages determined by this Court to have been sustained by her on account of individual Defendants' violation of Virginia state law.

(c)      Reasonable attorneys' fees and

(d)      Costs incurred and incidental to prosecuting this action.

8.      Such further reliefs as may be just and proper in the circumstances.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.


Dated: February 3, 2104                    Respectfully submitted,

                                           **DR. YVOUNE KARA PETRIE, DC**


                                              /s/ Vincent M. Amberly
                                           Vincent M. Amberly, Esq. (VA 48050)
                                           AMBERLY LAW
                                           129 Harrison Street, NE
                                           Leesburg, VA 20176
                                           Tel: 703-737-3545   Fax: 703-991-0770
                                           Email: vince@amberlylaw.com

                                           *Attorney for Plaintiff*
                                           *Dr. Yvoune Kara Petrie, DC.*